The final case set for argument today is No. 19-728, M.A. v. Garland. Ms. Unger. Good morning. May it please the Court, Mia Unger with the Legal Aid Society for Petitioner M.A. The agency found that Petitioner M.A. is likely to be tortured or killed upon deportation to Honduras by the violent Mara Salvatrucha MS-13 gang. After he refused to be extorted, MS-13 stabbed Petitioner in the chest and stomach and slashed both of his wrists, leaving him unconscious and requiring an eight-day hospitalization to recover. Petitioner then went into hiding, and when MS-13 couldn't find him, they murdered his nephew and then they murdered his 85-year-old father. Years later, MS-13 stabbed another nephew in the chest, leaving him unconscious after he refused to disclose Petitioner's whereabouts. Despite finding that Petitioner was likely to suffer grave harm rising to the severity of torture upon deportation and initially finding that such harm would be with the acquiescence of the Honduran government, the agency changed course and denied Petitioner's application for protection under the Convention Against Torture. There are two issues before this Court. One, what does it mean for a government to acquiesce to the torture of one of its citizens by a non-state actor? And two, were Petitioner's due process rights violated? We ask that this Court reiterate that the standard for government acquiescence can be found even when some government officials take action to prevent the torture, so long as at least one government official at any level of government would know of or be willfully blind to the torture and thereafter reach a legal responsibility to intervene to prevent it. Can I ask you a question on that? Sure. You put in a 28-day letter referencing the decision with Scarlett where essentially you sent it back to the agency because the law seems to be unclear as it relates to a cat claim and whether or not this unable-to-prevent-torture standard that you're urging us to apply would apply equally to a cat claim. So, why shouldn't we essentially do the same thing here as Scarlett did? Sure. So, actually, the inability to protect an applicant from torture is certainly relevant to the analysis. As the Seventh Circuit stated in Rodriguez-Molinaro v. Lynch, which is cited in our brief, it is success rather than effort that bears on the likelihood of Petitioner being killed or tortured if removed. However, it's not our argument that the inability to protect by itself meets the standard for acquiescence to torture. The real question is whether one or more public official at any level of government would know of or be willfully blind to the torture and thereafter reach a legal responsibility to intervene to prevent it. So, we actually agree with the court and with the government in this case that inability to protect alone is not enough to meet the standard, but we do find it to be extremely relevant and agree with this court's holding in Scarlett with regard to that aspect, that it is important for the agency to address the ability of a government to be able to protect its citizens, to be able to protect the applicant from torture. So, just to make sure I'm understanding, it's inability plus complicity, basically, of one or more law enforcement individuals in the country of removal. Is that what your proposed standard would be? That's correct. Our proposed standard is consistent with this court's precedent in Kuzam v. Ashcroft and De La Rosa v. Holder. Following this court's decision in Kuzam, the principal question is simply whether one or more public official would know of or be willfully blind to the torture and reach a legal responsibility to intervene to prevent them. Where government officials are complicit in acts of torture, that would meet the standard. And the inability to protect is relevant, it's just not dispositive. That would suggest that in any country where there is some corruption, it means that it's always going to be the case that a CAT claim can be brought. I don't believe that's true. So, you still would have to show that it's more likely than not that the individual petitioner would meet the standard, would be more likely than not to be tortured, which is an extremely high standard that was met in this case. I didn't hear you say that before. So, I think that then, I guess, is the focus that we ought to be on. I also think that there's a second part of the inquiry, which is whether it's more likely than not that a public official would acquiesce to the torture. So, you still have to show extensive evidence of collusion between government officials and the torture to be able to meet that standard. I don't understand. I don't think it would be, just following up with Judge Sullivan, I don't think it would be extensive evidence. If we adopted the standard you're suggesting, then any complicity at any level of law enforcement within a country would qualify, right? I don't know what country would have no evidence of some complicity, potentially, by some law enforcement officers, right? Well, if you have allegations that a specific government official would be complicit in the torture, would acquiesce to the torture, you can meet the standard. But in most cases, such as this case, you're not going to have allegations of a specific government official that is going to know of or be willfully blind to the torture. But where you have extensive evidence, as we do in this case, for example, of what the expert called a working relationship between the police and MS-13, then it's fair for the fact finder to find that it's more likely than not that at least one government official... It would have to be widespread at a lower level of law enforcement. It's not just people who have evidence of some corruption. It would be widespread police corruption. Sure. So, as we have in this case, the expert witness, Douglas Barrett, discussed how the neighborhood that Petitioner is from is a neighborhood long controlled by MS-13. He spoke about how MS-13 and the police have a, quote, working relationship in the neighborhoods that they control, such that the police will allow MS-13 members to enter and leave the neighborhood while killing with impunity. For $400 a night, the police will rent out their uniforms, ID badges, and weapons to gang members to use while kidnapping their victims. And police will accept money from MS-13 to turn a blind eye to their kidnapping and extortion. And perhaps most alarmingly, police will even accept money from MS-13 to commit extrajudicial killings of their rivals. But a lot of that... I'm sorry to interrupt. But a lot of that information predates the 2016 State Department report, right? Yes. The evidence from the expert was taken at the individual hearing in this case, which was in 2015. I'm sorry. Yes, in 2015. Okay. So then we have this 2016 report, which talks about efforts to correct this problem. And in fact, the retirement or the termination of like 3,000 police officers nationwide, which is something then that the IJ relied on. This kind of then leads into your due process point, I think. But didn't the IJ conclude, based on the 2016 report, that the petitioner failed to establish that the torture and acquiescence had been proven? I see my time is up. Can I respond to the question? Please go ahead and answer, Jessica. Okay. So yes, the immigration judge found that there were... There were two facts in the 2016 State Department report, or three facts, which he found to be significant. One regarded this police reform commission, which you mentioned. Another regarded two specific incidents where the government increased law enforcement to respond to gang threats. And then the third related to the security forces, which really isn't an issue here because here the extensive evidence regards collusion between the police and MS-13. Now, the immigration judge found these changes to be dispositive, but he never looked at whether these efforts were actually effective. And this was the issue that we raised in our motion to reconsider before the immigration judge, which unfortunately was not considered by the immigration judge because we had to file our notice of appeal and jurisdiction vested with the board. The board also did not respond to our due process arguments. But I would refer the court to page 100 of the administrative record, which contains our motion to reconsider, where we cited to the types of articles that we would have submitted to the court if we had been given an opportunity to respond. And we also noted that we wanted to recall our expert witness. Basically, this police reform commission was toothless because it didn't include the prosecution of the officers. And there's ongoing corruption in Honduras. One of the articles we noted discusses how there is an SDNY prosecution of high-level government officials in Honduras, saying that Honduras has state-sponsored drug trafficking. Another article notes that without prosecutions of the dismissed officers, that the officers can simply rejoin the police force. I'm sorry, I see I'm running out of time. You referred us to the CAR 100, right? So we can take a look there at the kind of evidence that you would propose to adduce. And you have two minutes of rebuttal. Thank you. Ms. Shea. May it please the court. My name is Jacqueline Shea, and I represent the Attorney General of the United States. I ask this court to come to the following two conclusions. One, the agency identified and applied the correct legal standard for government acquiescence. And two, the record does not compel the conclusion that the petitioner has met his burden to show more likely than not the government of Honduras would acquiesce to his future torture by the MS-13 gang. Your Honors, the agency applied the correct legal standard here. It set out the official action requirement, and it provided that acquiescence requires two elements. As this court noted in Scarlett, the CAT official action requirement is not the same as the unwilling and unable standard for government's role in asylum. Here, there is absolutely no proof of active involvement, instigation, or consent by a public official. And as your Honors mentioned, there's actually no complicity here as well. As the government, it's your position that the effectiveness is not part of acquiescence under a CAT claim? Is that what I just heard you say? The effectiveness. The effectiveness of the efforts. If steps are taken by a government, but they are completely helpless, as Scarlett said, to protect the victims, isn't that at a minimum a relevant factor in determining? It is a relevant factor, yes, Your Honor. But in this particular case, there is no evidence of that. The IJ found efforts the government has made to combat the corruption and gang violence were not effective. That was the first finding. And then, as Judge Sullivan pointed out, the 2016 report was then relied upon to say there was no acquiescence. And I saw in your brief, you said twice that it's been effective, it's been effective. But where in the record does the IJ say or point to anything to show that those efforts that were made in 2016 were effective? That's the key issue, I think. I think, Your Honor, the inference is made from his findings from the 2016 report that it has not, basically, it has not overcome to the level of corruption that would overcome basically allowing the gang to facilitate the torture. There's no evidence of anything in there. Officers, obviously, were dismissed to a large extent. But if the corruption is so rampant, that could have no effect. They're saying there's no effect on the prosecutions. So the homicide rate, the report that you relied on, says no significance in the overall homicide rate for the first six months of 2016. So I don't know where that inference would come from. Somehow, I understand what you're saying. It doesn't have to get completely better. If it shows some improvement, that might be enough. But I don't think there's anything in that report that shows any improvement. And I think, Your Honor, that's what it is. It's definitely an improvement. And if you take both country conditions and look at them, I mean, it says in Appendix 2, I mean, it took steps to address and investigate members of the security forces. And that wasn't in the prior 2013 country conditions report. Taking steps is not improvement. It's improvement in your intent. But the results, where is there improvement in results? That's really what I'm missing. Well, I think, Your Honor, again, going back to the context of how the IJ in this case, you know, basically made the determination, I think the initial 2015 IJ decision, Your Honor, it does look like the IJ conflated those standards, the withholding and asylum standard with the CAT standard. And then the board took, you know, the decision in De La Rosa, as well as the subsequent decisions, and really focused the IJ there to look at those cases. And that was the board specifically cited in its remand, the Orlando Vergonzales decision versus Pierre and Pierre, those decisions. And I think by the board showing those two decisions, the board was really distinguishing there between the inability to protect against official actors, which was in Pierre. In that case, there were some individuals wearing police uniforms, and the inability to protect against purely private actors, as we have here in the Orlando Vergonzales decision, which was another similar case where the MS-13 gang in the court noted, while there was some evidence of corruption that the El Salvador's facilities gang activity, there was also evidence that they made an active effort. And that's why the board remanded this case to the IJ to basically provide some more analysis, to basically resolve that conflicting evidence. And that's why... I do agree, though, that it's not enough to show efforts to control gang violence, but there has to be some kind of effectiveness in order to preclude a concern, at least, and maybe a finding of acquiescence that in this context, we would need to look at both. And particularly given the kind of showing that was made that the IJ and the BIA agreed about MA's status as really a target of this kind of violence. So that's leading me to think that in line with what we did in Scarlet, that a remand would be appropriate to include full consideration of a response to the 2016, maybe an updated report from the State Department on the status of both efforts and the effectiveness of those efforts. What would be wrong about taking that course of action? Your Honor, I think... Well, in that decision, in Scarlet's decision, yes, there was remand in that case, Your Honor. And I think a big part of the remand was also on a separate issue, the matter of AB. And it was recently clarified, that decision. So it was going back regardless, Your Honor. And I think another reason to go back as well was the cat finding. But in this case, the board basically did what the court in Scarlet did by sending back for remand and additional information. The board did that here. The board specified the issue, and I think the board's decision, the remand decision, it was really distinguishing and pointing the IJ to consider the difference between the inability to protect against purely private actors and distinguishing against official actors by citing those two cases there. And then the IJ was able to... Go ahead, Your Honor. I don't mean to interrupt you. No, I'm sorry. I'm interrupting you. But what is concerning me also is the 2016 report and the claim that Mr. M.A. did not have an opportunity fully to respond to the statements that the agency relied on in the report about the status of the government's efforts there. And I gather that the government's response here has been that that was really a strategic choice, that they just rested on what they had to do so far. But the motion for reconsideration suggested there was a lot more to consider in order to develop a full picture about whether the government would likely acquiesce or not. Is that wrong in having that view of the evidence? Well, Your Honor, I think the main case that they're citing, you know, the Berger case, that is clearly distinguishable from the present case, because in that case, the board is the entity that took administrative notice. In this case, it was the IJ. So they did... For one, I think they were on notice to begin with. On the remand order, it specifically said they could provide additional information, as well as, you know, in the merit... Let me interrupt there, though. You know, an invitation to provide specific information is less meaningful if you don't know what you're responding to. And at that point, my understanding was they didn't know that the IJ was going to refer or rely on the 2016 report. And the BIA, of course, is not in a position to do any fact-finding. So we're kind of left with the record as established, you know, when Mr. M.A. did not have an opportunity to respond to the 2016 report. Well, Your Honor, I think in the record at 31, in their brief and footnote, in their footnote 2, they specifically said that they considered the country condition reports and decided not to put them in. But I think they were reasonably on notice because of the remand here. The board was saying that... Isn't there a difference between not relying on something versus having an opportunity to respond to it? I mean, they may not have wanted to rely on those for any reason. But aren't they also entitled to an opportunity if the IJ is going to rely on it to respond to it and address it? Isn't that pretty basic? Well, they were able to respond to that, to the board, as well as... Judge Carney pointed out the board doesn't do fact-finding. They didn't get to put on evidence, right, to say this report is wrong or it has this updated information beyond that report that shows it's ineffective. There's a lot of things they may have done before the IJ they couldn't do before the board, right? Well, Your Honor, I think it's reasonable based on the narrowness of the remand to the IJ. The whole issue to be considered on remand was acquiescence. And if you would look back to the IJ's prior decision, what did he rely on when he made that determination? He relied on the 2013 Country Condition Reports, the testimony. So I think it was reasonable. And as well in the merits hearing on remand, the IJ specifically said, is there going to be any additional background information provided? I think all those things, as well as... Why didn't the agency put it? It was so reasonable and clear that this would be part of the record on remand. The agency didn't put it in either, right? You're right, Your Honor. It didn't put it in there. But I think this court has routinely, you know, sent cases back. I mean, this was three years past. So I think it's not like one year passed and they decided to use the updated reports. But just the time that took place in this case, it's reasonable for that. I see that I'm out of time, Your Honor. May I briefly conclude? Yes, take a minute. Your Honor, the inability to control private actors with no involvement of official actor should not constitute acquiescence. Accordingly, we ask this court to deny the petition for review. Thank you. Thank you, Ms. Shea. Ms. Unger, you have two minutes of rebuttal. Thank you. So just quickly, this is not a case where we don't have any evidence of government official involvement in the torture. We don't have any evidence that a specific government official would be involved in the specific torture of the petitioner. However, there is extensive evidence in the record regarding the collusion between government officials and MS-13 such that it is more likely than not that a government official would know of or be willfully blind to the torture and reach a legal responsibility to intervene. Ms. Unger, can I ask this question? I mean, it would seem that the 2016 report would suggest that it's less likely to happen after 2016 following the firing or retirement of 2,000 presumptively corrupt police officers, right? Well, as I noted before, the simple dismissal of the police officers doesn't necessarily reduce the collusion between the police and... But it's not that, right? But it isn't that. I mean, it's not just simply that 2,000 people retired. It's that there were efforts to investigate and remove corrupt police officers. And as a result of that effort, 2,000 police officers were removed or voluntarily retired, correct? Correct. One of the articles that we cited in our motion to reconsider discussed how, without the ability to prosecute those officers, that really this police reform commission was purely administrative. But I also want to go back to the issue of notice and that we weren't given notice that the immigration judge was going to be taking administrative notice. While it is correct that the parties had an opportunity to submit additional evidence on remand, the board never suggested that additional country conditions evidence was required, that the country conditions needed updating, or that there had been any change in country conditions in Honduras. Wait, wait. The immigration judge... I'm sorry to interrupt you, but I mean, this is standard. I mean, these things are routinely introduced. Everybody's aware of them. And your client was representative at this stage, right? Well, the remand was... That's correct. He was represented by me. So you're saying that the council was unaware of this 2016 report and the contents of it? We were unaware that the immigration judge was going to be taking administrative notice of the report. Different question. Were you... I don't know if it was you, but council was not oblivious to the fact the existence of a 2016 report and its contents, right? That is correct. And I would refer the court to the 2016 report, which the government added as an appendix to its brief. It's a 43-page report, which contains extensive evidence about both corruption and impunity in Honduras and efforts to reform corruption and impunity. And that same State Department report actually notes on page 10 that police officers engaged in crimes with criminal organizations. And there's ongoing corruption and... Did those follow the kind of retirements that Judge Sullivan was pointing to? Or do we know whether they were concurrent with or preceded? We don't know. The country conditions report doesn't specify that. And that's exactly why we would have wanted the opportunity to submit additional evidence to really flesh out what the situation was in Honduras at the time. I know that I'm out of time. The stakes could not be any higher in this case, as there is no dispute that MS-13 is likely to torture or kill Petitioner M.A. in Honduras. The only reasons why M.A. was not granted relief were first, a misunderstanding of this court's precedent, and second, the administrative notice of facts without due process. We ask this court to correct these legal errors and ensure that the United States is complying with its legal obligation not to return Petitioner to a country where he is likely to be tortured. Thank you very much. Thank you both for your arguments. We'll take the matter under advisement. This concludes our oral argument today. We have two matters on submission, U.S. v. Gonzales, number 192086, and Richardson v. City of New York, number 203560. We will take those on submission. Thank you very much. The clerk will please adjourn court. Thanks, adjourn.